# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ELIZABETH ANN HOLLOWAY,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **CIVIL ACTION NO.** |
| | ] | **2:18-CV-00176-KOB** |
| **OXYGEN MEDIA, LLC, and** | ] | |
| **BRIAN GRADEN MEDIA, LLC,** | ] | |
| | ] | |
| **Defendants.** | ] | |

## MEMORANDUM OPINION

As defendants frequently point out, and as courts regularly affirm, even the most deeply wounding conduct rarely gives rise to civil liability for the tort of outrage. Suffering offense from truly insulting conduct is sometimes an unfortunate fact of life, so the law understandably hesitates to impose money damages for causing emotional distress in the minds of others. But, in very limited circumstances, the law recognizes extremely egregious conduct that no person should be expected to endure without some sort of civil justice. This case plausibly presents such outrageous conduct.

Twelve years after Natalee Holloway disappeared while on a high school trip to Aruba in 2005, Defendants Oxygen Media and Brian Graden Media tried to capitalize on the world's fascination with the tragedy. Defendants produced and published what they termed a six-part "true crime documentary" series entitled

1

"The Disappearance of Natalee Holloway." The series documented a so-called "unscripted" and "real-time investigation" of what happened to Natalee when she disappeared.

But Natalee's mother, Plaintiff Beth Holloway, alleges that the series was not a "true-crime documentary" or a legitimate "investigation" whatsoever. Instead, Ms. Holloway contends that it was scripted and outrageous fiction produced and published at the expense of her severe emotional distress. In addition, she alleges that Defendants fraudulently procured her DNA in production of the series.

Defendants have filed a motion to dismiss Ms. Holloway's claims for fraud and the tort of outrage. The court will DENY the motion. As further explained below, Ms. Holloway has pled with particularity the fraudulent procurement of her DNA by plausible agents of Defendants. And she has sufficiently alleged facts showing a plausible claim for the tort of outrage.

## I.    STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss challenges whether a complaint contains "a short and plain statement of the claim showing that the pleader is entitled to relief" as required by Rule 8(a)(2) of the Federal Rules of Civil Procedure.

Specifically, a defendant may move to dismiss a complaint under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." The

burden then shifts to the plaintiff to show that her complaint "allege[s] 'enough facts to state a claim to relief that is plausible on its face.'" *Adinolfe v. United Tech. Corp.*, 768 F.3d 1161, 1169 (11th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

For a claim to be "plausible on its face," it must contain enough "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And the court accepts as true the factual allegations in the complaint and construes them in the light most favorable to the plaintiff. *Id.*

But not all allegations can defeat a motion to dismiss. "[L]abels and conclusions" and speculation "will not do." *Twombly*, 550 U.S. at 555. So, the court will only look at well-pled *facts*, and if those facts, accepted as true, state a plausible claim for relief, then the plaintiff will survive a motion to dismiss. *Iqbal*, 556 U.S. at 678.

## II.     FACTUAL BACKGROUND

As the court must do on a motion to dismiss, the court accepts as true the following well-pled factual allegations.

Natalee Holloway disappeared on May 30, 2005 while on a high school senior class trip in Aruba. Print and broadcast media gave Natalee's disappearance "nearly unprecedented" and "round-the-clock" coverage. (Doc. 23 at ¶ 45).

Natalee's mother, Beth Holloway, has worked tirelessly to find Natalee, but neither Natalee nor her remains have ever been located.

### A.    <u>The Series</u>

Defendants produced and published a six-part television series entitled "The Disappearance of Natalee Holloway" (the "Series"). The Series aired between August 19, 2017 and September 23, 2017. Defendants marketed the Series as an "'unscripted' 'real-time investigation' and 'documentary' following 'a new lead that could deliver justice for Natalee once and for all,' including 'the specifics of what happened to her and the remains of her body.'" (Doc. 23 at ¶ 57).

The Series followed Natalee's father and Beth Holloway's ex-husband, Dave Holloway, and his private investigator, T.J. Ward, as they investigated John Ludwick, the suspect who claimed to have exhumed and desecrated Natalee's remains in Aruba and asserted that he knew where Natalee's remains were buried.

Ms. Holloway alleges that the Series and the "real-time" events that it depicted were actually scripted. She relies on the complaint in the matter styled *Kramer v. Brian Graden Media, LLC, et al.*, Case No. 2:17-cv-5990 (C.D. Cal. Aug. 11, 2017), where the plaintiff, Edward Kramer, sought compensation for services he alleges that he rendered to Oxygen and BGM for the Series. (Doc. 23 at ¶ 62). Mr. Kramer asserted in that case that he created the Series as early as the fall of 2014. (*Id.* at ¶ 69). Mr. Kramer alleged that he created the plot, plans,

scenarios, episode guides, and resolution for the Series; that is, he "scripted" the Series beforehand. (*Id.* at ¶ 64). In addition, Mr. Kramer alleged that the main characters in the series, even those depicted in the Series as unaware that they were being filmed, were paid participants. (*Id.* at ¶¶ 70, 74, 76, 79–80).

As depicted in the Series, on March 19, 2017, Mr. Ludwick took his roommate, Gabriel Madrigal, to identify the grave site in Aruba where Mr. Ludwick claimed to have dug up Natalee's remains. But Mr. Ludwick could not find the grave site. (Doc. 23 at ¶¶ 86–87).

Then, on April 6, 2017, Mr. Madrigal told Mr. Holloway and Mr. Ward that Mr. Ludwick would travel to Aruba again "to pinpoint the exact location and cooperate with the Aruban authorities in showing the exact location [of Natalee's remains] and hopefully solving the case." (Doc. 23 at ¶ 90). But on Mr. Ludwick's second trip to Aruba, he again could not find the grave site. In addition, Mr. Ludwick could not identify the cave near his aunt's property where he claimed that he and another man burned Natalee's skull. Defendants then cut ties with Mr. Ludwick "because they believed the lead to have been false and unfounded." (*Id.* at ¶ 94).

But the Series then depicts a third visit to Aruba, this time filmed on Mr. Madrigal's cell phone and purportedly undertaken without Defendants' knowledge. Mr. Madrigal and Mr. Ludwick stated on the cell phone videos that they "returned

to Aruba for a third time to 'bring Natalee home' and because Ludwick knew

where her remains are because 'he kept [them] as a trophy.'" (Doc. 23 at ¶ 96).

During this third search, within seconds of the men's arrival at Mr.

Ludwick's aunt's house, Mr. Ludwick uncovered a Ziploc bag "from just beneath

the ground surface" containing four bone fragments. (Doc. 23 at ¶ 100).

According to Ms. Holloway, "[t]he Ziploc bag, supposedly buried for seven years,

appears fairly new, clean, and in good condition." (*Id.* at ¶ 101).

The Series then shows more footage from Mr. Madrigal's cell phone on

which Mr. Ludwick fails to identify the grave site with the rest of Natalee's

remains. (Doc. 23 at ¶¶ 104–05).

**B.     The Bone Fragments and Ms. Holloway's DNA**

Mr. Holloway and Mr. Ward traveled to Aruba to collect the bone

fragments. Aruban authorities advised the men that the bones were animal

remains. (Doc. 23 at ¶ 5).

Defendants then delivered the bone fragments to their forensic expert, Dr.

Jason Kolowski. Defendants told Dr. Kolowski that Mr. Ward recovered the bone

fragments from a pet cemetery. Defendants did not disclose that Mr. Ludwick

found the bones in a Ziploc bag without any corroboration. Dr. Kolowski later told

Ms. Holloway that Defendants did not inform him of the true origin of the bones

because he could have been "burned" professionally by testing bone samples

contaminated by Mr. Ludwick.  (Doc. 23 at ¶ 14).

Dr. Kolowski first tested the bone fragments for nuclear DNA, the presence of which would establish that the bones were human and from which Dr. Kolowski could identify the person to whom the remains belonged.  The test came back negative.  (Doc. 23 at ¶ 12).

Dr. Kolowski then tested the bone fragments for mitochondrial DNA, which all living beings possess.  At best, because mitochondrial DNA cannot uniquely identify one person, the test would allow Dr. Kolowski to "exclude the Bone Fragments as belonging to Natalee or determine that the bones belonged to an individual with a mitochondrial DNA sequence similar to Natalee's, a sequence that is presumably shared very widely amongst humankind."  (Doc. 23 at ¶ 5).  The test revealed the *presence* of human mitochondrial DNA belonging to a Caucasian individual; it did not reveal that the bones themselves were human bones.

According to Ms. Holloway, the presence of human mitochondrial DNA "is not at all surprising—and may even be expected—given that the Bone Fragments were handled and likely contaminated by Mr. Ludwick, a Caucasian and a heroin addict."  (*Id.* at ¶ 13).  Defendants did not perform a speciation test or submit the bones to an anthropologist to determine whether the bone fragments were human bones.

On August 10, 2017, Mr. Holloway called Ms. Holloway privately and

advised her that "human female remains," at least ten years old and from a single Caucasian individual, were discovered at a "grave site" in Aruba. (Doc. 23 at ¶¶ 6–7, 112). Mr. Holloway asked Ms. Holloway for a DNA sample. The same day, Dr. Kolowski told Ms. Holloway that the DNA test would either match the bone fragments to Natalee or fully exclude that the bones belonged to Natalee. Ms. Holloway provided a sample of her DNA two days later.

Neither Mr. Holloway nor Dr. Kolowski informed Ms. Holloway of the true origin of the bones or the circumstances of their discovery. The men did not tell her that Dr. Kolowski had not determined that the bones were human or female; that Defendants would use her DNA for the Series; that the Series existed at all; that Dr. Kolowski could not match the bones to Natalee even with Ms. Holloway's DNA; or that Mr. Ludwick, who was Caucasian and a paid participant in the Series, recovered the bone fragments from a Ziploc bag only after Defendants stopped filming him and after twice failing to locate the bone fragments. (Doc. 23 at ¶¶ 7, 118, 128).

The Series then turned all of its attention to the bone fragments and DNA testing. The Series depicted a staged meeting between Mr. Holloway, Mr. Ward, and Dr. Kolowski held on August 17, 2017. Defendants conveyed this scene as the first time that Mr. Holloway and Mr. Ward learned the results of Dr. Kolowski's initial DNA testing, but Mr. Holloway had already informed Ms. Holloway of the

results one week before the meeting.  Also in this scene, Defendants conveyed that some or all of the bone fragments were human, that the bone fragments belonged to a Caucasian of European descent, and that Ms. Holloway's DNA could definitively determine whether the bone fragments belonged to Natalee.  (Doc. 23 at ¶¶ 122–27).

On September 22, 2017, Defendants received a laboratory report that the results of the DNA tests were not reportable.  (Doc. 23 at ¶ 135).

Defendants aired the Series finale on September 23, 2017.  The episode shows a meeting between Mr. Holloway, Mr. Ward, and Dr. Kolowski on September 11, 2017.  In the scene, Defendants convey that they were expecting a match, inconclusive results, or a full exclusion with the DNA test.  The episode ends without divulging the results of the DNA test.  (Doc. 23 at ¶ 134).

All along, the bone fragments came from the skull of a wild boar.  Mr. Ludwick admitted to Mr. Madrigal that he planted the bones.  (Doc. 23 at ¶¶ 8–9).

## C.    **The Articles**

Between August 16 and September 21, 2017, Oxygen published seven articles about the Series on Oxygen.com to generate hype for the Series.  The title of each article identified below accurately portrays the contents of each article.

On August 16, 2017, Oxygen published an article entitled "Natalee Holloway's Dad Reveals Investigators Have Uncovered Human Remains in New

Interview" on Oxygen.com.  (Doc. 23-1).

On August 21, 2017, Oxygen published an article entitled "4 Crucial Details to Know About the New Lead in the Natalee Holloway Case" on Oxygen.com. (Doc. 23-2).

On August 24, 2017, Oxygen published an article entitled "DNA Testing Proves Bones from Natalee Holloway Search are from a Single Human of Caucasian, European Descent" on Oxygen.com.  (Doc. 23-3).

On September 2, 2017, Oxygen published an article entitled "Friend of Jordan Van Der Sloot Says he was Paid to Dig Up Natalee Holloway's Remains and Cremate Them" on Oxygen.com.  (Doc. 23-4).

On September 8, 2017, Oxygen published an article entitled "Meet the Forensic Scientist Who's Helping in the Search for Natalee Holloway's Remains" on Oxygen.com.  (Doc. 23-5).

On September 16, 2017, Oxygen published an article entitled "Jordan Van Der Sloot's Friend Says they Burned Natalee Holloway's Skull in a Cave" on Oxygen.com.  (Doc. 23-6).

On September 21, 2017, two days before the Series finale, Oxygen published an article entitled "The Latest on the Natalee Holloway DNA Testing" on Oxygen.com.  (Doc. 23-7).  This article provides pictures of the four bone fragments and states that at least one of the bone fragments came from a Caucasian

human and contained mitochondrial DNA.

**D.    Procedural History**

Ms. Holloway filed her amended complaint on July 31, 2018.  (Doc. 23).  In her amended complaint, she brings one count of fraud and one count of outrage against both Defendants.  She alleges that Defendants committed fraud when Mr. Holloway and Dr. Kolowski, acting as agents for Defendants, procured her DNA under false pretenses.  And she alleges that Defendants committed the tort of outrage by procuring her DNA under false pretenses and by publishing the Series and the seven online articles.

Defendants filed a motion to dismiss the amended complaint.  (Doc. 26).  In their motion to dismiss, Defendants assert that Ms. Holloway failed to plead fraud with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure, that she failed to allege facts showing intentional, reckless, extreme, or outrageous conduct to state a claim for the tort of outrage under Alabama law, and that the First Amendment protects Defendants' publications from tort liability.

The court will address both of Ms. Holloway's claims, and, in doing so, will find that she has stated a plausible claim for relief as to both claims and that the First Amendment does not protect Defendants' publications.

**III.   ANALYSIS**

**A.    Fraud**

Ms. Holloway's fraud claim arises out of Defendants' private conduct. She contends that Mr. Holloway and Dr. Kolowski, acting on behalf of Defendants and for the benefit of the Series, intentionally deceived her to obtain her DNA.

To state a claim of fraud under Alabama law, a plaintiff must show "(1) a false representation, (2) of a material existing fact, (3) reasonably relied on by the claimant (4) who suffered damage as a proximate consequence of the misrepresentation." *Drummond Co. v. Walter Indus., Inc.*, 962 So. 2d 753, 788 (Ala. 2006) (citing *Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 875 So. 2d 1143 (Ala. 2003)).

In addition, when alleging fraud, the plaintiff "must state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b). To meet the Rule 9(b) heightened pleading standard, the complaint must state "(1) precisely what statements were made; (2) the time and place of each statement and the person responsible for making the statement; (3) the content of each statement and how those statements misled the plaintiff; and [(4)] what the defendants obtained as a consequence of the fraud." *Graveling v. Castle Mortg. Co.*, 631 F. App'x 690, 694 (11th Cir. 2015) (citing *Ziemba v. Cascade Int'l, Inc*., 256 F.3d 1194, 1202 (11th Cir. 2001)).

Ms. Holloway has sufficiently alleged facts that satisfy each element of a fraud claim. She alleges that Mr. Holloway and Dr. Kolowski, acting as agents of

Defendants, falsely represented to her that Mr. Holloway and Mr. Ward had found human female remains at a grave site in Aruba that belonged to a female, and that they needed Ms. Holloway's DNA to determine if the bones matched Natalee's DNA. (Doc. 23 at ¶¶ 11–16, 139, 141, 143, 152–54). The location of Natalee's remains was a material fact to Ms. Holloway. Ms. Holloway reasonably relied on the representations because they came from her ex-husband and Natalee's father who had also been searching for Natalee ever since she disappeared. And Ms. Holloway alleges that she suffered severe emotional distress and corresponding physical distress because of the false representations, so she has alleged each of the four elements of her fraud claim. (*Id.* at ¶¶ 196, 198).

And she has pled fraud with particularity as required by Rule 9(b). She alleges precisely who made the statements: Mr. Holloway and Dr. Kolowski, acting as agents of Defendants. She alleges precisely when Mr. Holloway and Dr. Kolowski made the statements: August 10, 2017, on the phone. She alleges precisely what Mr. Holloway and Dr. Kolowski said: Mr. Holloway told her that he and Mr. Ward found human female remains at a grave site in Aruba and needed her DNA, and Dr. Kolowski told her that a DNA test could match the bones to Natalee's DNA. But in truth, Mr. Ludwick and Mr. Madrigal, not Mr. Holloway and Mr. Ward, found the bones; the men found the bones at Mr. Ludwick's aunt's house, not a grave site; nobody knew that the bones belonged to a female; and they

could only make an "exclusion" with Ms. Holloway's DNA, not a "match."

In addition, she alleges precisely how Mr. Holloway misled her. She alleges that Mr. Holloway concealed several material facts: (1) that Defendants were filming a show that would broadcast the DNA test results (doc. 23 at ¶¶ 118, 156, 160–61, 183); (2) that Mr. Ludwick was a paid participant and a heroin addict who failed to uncover the purported grave site on two prior occasions (*id.* at ¶¶ 86–87, 90–93, 177, 182, 235); (3) that Mr. Ludwick found the bone fragments only after Defendants had stopped filming him (*id.* at ¶¶ 95–101, 178–82); and (4) that Mr. Ludwick discovered the bones in a Ziploc bag that appeared new (*id.* at 98–101, 175). These specific allegations satisfy the heightened Rule 9(b) pleading standard.

Defendants make two unpersuasive arguments for why Ms. Holloway has failed to plead fraud with particularity. First, Defendants contend that Ms. Holloway has failed to "plead sufficient facts to 'inform each defendant of the nature of [its] alleged participation in the fraud'" as required to state a fraud claim against multiple defendants. *Transatlantic, LLC v. Humana, Inc.*, 666 F. App'x 788, 789 (11th Cir. 2016) (quoting *Brooks v. Blue Cross and Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997)); (*see* Doc. 26 at 11). The court disagrees.

Neither Defendant can legitimately claim that it is not aware of its alleged

role in the fraud.  Ms. Holloway alleges that *each* Defendant produced and published the Series jointly with the other Defendant, and that Mr. Holloway and Dr. Kolowski acted as agents of *each* Defendant.  And, again, she alleges precisely how Mr. Holloway and Dr. Kolowski misled her.  So, Ms. Holloway has alleged fraud particularly against *each* Defendant.

Second, Defendants contend that Ms. Holloway has failed to allege facts showing that Mr. Holloway and Dr. Kolowski were agents of Defendants, such that Defendants cannot be held liable as principals for Mr. Holloway's and Dr. Kolowski's fraudulent misrepresentations.  (Doc. 26 at 12–15).  Again, the court disagrees.

Under Alabama law, "it is axiomatic that for an agency relationship to exist, there must be right of control by the principal over the agent.  But, it is not essential that the right of control be exercised so long as that right actually exists." *Nat'l Sec. Fire & Cas. Co. v. Bowen*, 447 So. 2d 133, 137 (Ala. 1983) (citations omitted).  And "the existence and scope of a principal-agent relationship is normally a question of fact to be determined by the jury."  *Id.* at 138.

Ms. Holloway has alleged several facts that show Defendants plausibly had the right to control Mr. Holloway and Dr. Kolowski, and that the men were acting in the scope of their principal-agent relationship with Defendants.  She alleges that Mr. Holloway and Dr. Kolowski were paid participants and main characters in the

Series; that Defendants instructed the men to obtain Ms. Holloway's DNA for the Series; that Defendants concealed from Dr. Kolowski the true circumstances of the discovery of the bone fragments so that he would obtain and test Ms. Holloway's DNA; that Defendants scripted what the men had to carry out; that Defendants required the men to perform the scope of work specified in their contracts in furtherance of Defendants' business; that Defendants required the men to keep the production of the Series confidential; and that Defendants could withhold payment to the men if they did not perform their roles. (Doc. 23 at ¶¶ 14, 194–202). These factual allegations show a plausible principal-agent relationship by which Defendants had the right and ability to control Mr. Holloway and Dr. Kolowski's efforts to obtain Ms. Holloway's DNA for the Series.

Ms. Holloway has thus alleged fraud with particularity against each Defendant and she has alleged facts showing a plausible principal-agent relationship between Mr. Holloway, Dr. Kolowski, and Defendants. So the court will DENY Defendants' motion to dismiss Ms. Holloway's fraud claim.

### B.   Outrage

Ms. Holloway next alleges that Defendants committed the tort of outrage both privately and publically. As to private conduct, she alleges that Defendants committed outrage by procuring her DNA under false pretenses through their agents, Mr. Holloway and Dr. Kolowski. As to public conduct, she alleges that

Defendants committed outrage by publishing the Series and the seven online articles.

The tort of outrage "is an extremely limited cause of action" for the recovery of damages for severe emotional distress. *Wilson v. Univ. of Alabama Health Servs. Found., P.C.*, --- So. 3d ---, 2017 WL 6397654, at *2 (Ala. Dec. 15, 2017) (internal quotations and citations omitted). To state a claim for outrage, a plaintiff must show that the defendant's conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Id.* (citing *Green Tree Acceptance, Inc. v. Standridge*, 565 So. 2d 38, 44 (Ala. 1990)). Ms. Holloway has sufficiently alleged facts under each of these elements.

### 1. Intentional or reckless

Ms. Holloway has alleged facts showing that Defendants acted at least recklessly by procuring her DNA under false pretenses and by publishing the Series. Ms. Holloway alleges that Mr. Holloway concealed material facts about the discovery of the remains in Aruba—all of which cast significant doubt on the origin of the bones and discredited Mr. Ludwick—to take advantage of her desperation and entice her into giving a DNA sample. And she alleges that Defendants knew or should have known that several statements in the Series were false. For example, she alleges that the Series provided several gruesome

descriptions of Natalee's murder and the desecration of her remains, but Defendants should have known that the descriptions were false because Mr. Ludwick, the only source of Defendants' information, failed to recover Natalee's remains on numerous occasions, recovered pig bones from an apparently new Ziploc bag only after Defendants stopped filming him, was a heroin addict, and failed to corroborate any of his claims.

From these factual allegations, the court can infer that Defendants, at the very least, acted with reckless disregard for the truth by procuring Ms. Holloway's DNA and publishing the Series.

### 2. *Extreme and outrageous conduct that caused emotional distress so severe that no reasonable person could be expected to endure it*

Courts in Alabama generally consider the second and third element of an outrage claim together. *See, e.g.*, *Wilson*, 2017 WL 6397654, at *2, and *Whitt v. Hulsey*, 519 So. 2d 901, 903–06 (Ala. 1987) (discussing "extreme and outrageous" conduct and distress "so severe that no reasonable person could be expected to endure it" together). This court will do the same.

For conduct to be "extreme and outrageous" that caused emotional distress "so severe that no reasonable person could be expected to endure it" to satisfy an outrage claim, it must be "so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized

society." *Wilson*, 2017 WL 6397654, at *2 (internal quotations and citations omitted).

The following circumstances that could *not* support an outrage claim demonstrate the substantially heavy burden in showing that conduct is "extreme and outrageous" under Alabama law: a law enforcement officer coerced a prisoner into waiving her rights, lied that her attorney abandoned her, and threatened her with "sizzling" and "frying" in the electric chair, *Tinker v. Beasley*, 429 F.3d 1324, 1330–31 (11th Cir. 2005); a city council member said if "things had gotten ugly" during a fight at a city hall, "we'd be having [plaintiff's] funeral," *Little v. Robinson*, 72 So. 3d 1168, 1173 (Ala. 2011); a defendant abused, insulted, and threatened a plaintiff with wrongful foreclosure to collect a debt, *Green Tree*, 565 So. 2d at 45; and a defendant threatened, abused, humiliated, and terminated an employee without cause, and thereby caused the employee's weight loss and insomnia, *Am. Rd. Serv. Co. v. Inmon*, 394 So. 2d 361, 367 (Ala. 1980).

But the Supreme Court of Alabama has found a viable claim for outrage in three general circumstances: "(1) wrongful conduct in the family-burial context; (2) barbaric methods employed to coerce an insurance settlement; and (3) egregious sexual harassment." *Wilson*, 2017 WL 6397654, at *3 (citations omitted). But the Supreme Court of Alabama has "not held that the tort of outrage can exist in <u>only</u> those three circumstances." *Id.* (emphasis in original).

Notably, Alabama law affords "[g]reat respect [to] the resting place of the dead" and particularly condemns conduct that interferes with burials, human remains, and resting places. *Whitt*, 519 So. 2d at 906. For example, the Supreme Court of Alabama held that disinterring a corpse, throwing acid on it, and disposing of some of it in the woods to solve an odor problem could support an outrage claim. *Gray Brown-Serv. Mortuary, Inc. v. Lloyd*, 729 So. 2d 280, 285–86 (Ala. 1999). The Court also found that trespassing on part of a cemetery with a bulldozer and causing damage to a tombstone could support an outrage claim. *Whitt*, 519 So. 2d at 905–06. And the Court found that an undertaker's misrepresentation of the decay of the plaintiff's husband's body to entice the plaintiff into buying an unnecessarily expensive casket, and the unlawful retention of the body to force payment, was outrageous conduct that justified an award of damages for emotional distress. *Levite Undertakers Co. v. Griggs*, 495 So. 2d 63, 64 (Ala. 1986). Further, the Court found that stopping a funeral at the last second and moving the funeral to an undug grave at a separate cemetery lot could support an outrage claim. *Cates v. Taylor*, 428 So. 2d 637, 638 (Ala. 1983).

This case involves misconduct and misrepresentations regarding the *discovery* of human remains, rather than the interference with known human remains in the cases identified above. But, given Alabama law's heightened concern with human remains and loved ones' connection with the deceased, and

given the egregious nature of Defendants' conduct as alleged by Ms. Holloway, the court cannot say at the motion to dismiss stage that Defendants' conduct was not *plausibly* extreme and outrageous that caused Ms. Holloway emotional distress so severe that no reasonable person could be expected to endure it.

Ms. Holloway alleges that Mr. Holloway gave her a false glimmer of hope after twelve years of searching for her daughter's remains. He called her and told her that "human female remains" were discovered at a "grave site" in Aruba and that they could determine whether the bones matched Natalee if Ms. Holloway provided a DNA sample. But Mr. Holloway concealed the truth that no meaningful chance existed that the remains belonged to Natalee and that Defendants had a financial motivation to procure her DNA.

In particular, Mr. Holloway did not tell Ms. Holloway that Mr. Ludwick, a paid participant in an allegedly scripted television series, found the bones after twice failing to uncover Natalee's remains after claiming to know of their location, and only found the bones that the Aruban authorities described as animal bones at his aunt's house in an apparently new Ziploc bag after Defendants stopped filming him. Mr. Holloway also falsely claimed that the bones were from a female and hid that the DNA found on the bones could likely have come from Mr. Ludwick after he "discovered" them. And then Dr. Kolowski added to Ms. Holloway's false hope by telling her that her DNA could match the bones to Natalee's DNA, even

though Ms. Holloway's DNA could only exclude the bones as belonging to Natalee.

Ms. Holloway thus alleges facts that show Defendants essentially took advantage of her grief and tireless efforts to find her daughter's remains by baiting her with false hope for the benefit of a television series. Such conduct is plausibly extreme and outrageous and so severe that no reasonable person could be expected to endure it under Alabama law.

And Defendants also plausibly undertook extreme and outrageous conduct by publishing the Series. Ms. Holloway has alleged facts showing that Defendants subjected Ms. Holloway to a sham that took advantage of her grief and her daughter's disappearance week by week. She alleges that the Series was scripted and thus designed to capitalize on viewers' fascination with Natalee's disappearance and followed leads that Defendants knew or should have known were bogus. The Series—a supposedly "true crime documentary" and "real-time investigation—presented several gruesome descriptions of Natalee's murder and the desecration of her body as credible information. (*See* Doc. 23 at ¶ 227). But, in reality, Defendants had more than enough reasons to doubt the veracity of Mr. Ludwick's claims, much less make him the main character of a "true crime documentary."

Of course, the First Amendment's guarantee of freedom of speech and

freedom of the press protects Defendants' publications from tort liability, but that

protection is not absolute. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56

(1988). The First Amendment does *not* protect against a claim for outrage brought

by a public figure if "the publication contains a false statement of fact which was

made with 'actual malice,' *i.e.*, with knowledge that the statement was false or with

reckless disregard as to whether or not it was true." *Id.*

Here, Ms. Holloway has alleged facts showing, and the parties do not

dispute, that she is a public figure. The media gave her daughter's disappearance

"nearly unprecedented media coverage with round-the-clock coverage of the

investigation." (Doc. 23 at ¶ 45). Ms. Holloway worked with several public

officials, including presidents, senators, and governors, and "the media, celebrities,

and countless others in her ongoing efforts to find Natalee." (*Id.* at ¶ 47). She

published a book about Natalee's disappearance and the aftermath. (*Id.* at ¶ 21).

Ms. Holloway describes herself as "that desperate mother on TV holding up

pictures of her missing child, pleading for help, describing the details surrounding

an unthinkable crime . . . living an endless nightmare in front of the whole world."

(*Id.*). These allegations show that Ms. Holloway is a public figure for purposes of

her outrage claim. *See Holloway v. Am. Media, Inc.*, 947 F. Supp. 2d 1252, 1261

n.8 (N.D. Ala. 2013) ("[T]he parties in this case do not dispute that Elizabeth

Holloway, who sought publicity about the disappearance of her daughter and

appeared frequently on television after Natalee disappeared, also is a public figure.").

In addition, Ms. Holloway has alleged facts showing that Defendants plausibly acted with actual malice in publishing the Series. She first alleges that Defendants made several false statements of fact in the Series, particularly descriptions of the murder of Natalee, the location and desecration of her remains, that Defendants discovered human remains, and that Defendants could match the bone fragments to Natalee. (Doc. 23 at ¶¶ 227, 259–60). These statements are false because the location of Natalee's remains and the manner in which Natalee died, if she died, is unknown. And Defendants did not, in fact, discover human remains and never received test results showing that the bones were human. Further, Defendants could never match the bone fragments to Natalee with Ms. Holloway's DNA.

And Ms. Holloway has alleged several facts showing that Defendants plausibly acted with intentional or, at least, reckless disregard for the truth of the statements they made in the Series. She alleges that the Aruban authorities informed Defendants that the bones in Aruba were animal bones; that Defendants should have known that Mr. Ludwick, their primary source, lacked any credibility because his story changed significantly during the course of the Series and he failed to locate the remains on several occasions; that Mr. Ludwick almost

immediately found the bones in a Ziploc bag when he returned to his aunt's house without corroboration; that Defendants should have known that Mr. Ludwick was highly unlikely to incriminate himself in criminal activity; that Defendants themselves harbored serious doubts as to the truth of the information they published; that Defendants failed to conduct a reasonable investigation into Mr. Ludwick's claims; that Defendants published episodes before receiving the DNA test results so they could market the Series as discovering Natalee's remains; and that Defendants delayed the DNA test results so they could publish the Series with plausible deniability as to the results at the time of publication.  (Doc. 23 at ¶¶ 277, 284–90, 294–99).  And, at all times, Defendants marketed the allegedly scripted series as an unscripted true-crime documentary.

From these allegations, the court may infer that Defendants either knew that they were publishing false claims in the Series or purposefully hid themselves from the obvious falsity of the claims, and thus plausibly acted with actual malice to avoid the First Amendment's protections.

So, as she does with Defendants' private conduct, Ms. Holloway states a plausible claim for the tort of outrage as to Defendants' publications.

## IV.  CONCLUSION

By separate order, the court will **DENY** Defendants' motion to dismiss.

**DONE** and **ORDERED** this 7th day of January, 2019.

_____
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE